D. GILL SPERLEIN (SBN 172887)
THE LAW OFFICE OF D. GILL SPERLEIN
345 Grove Street
San Francisco, California  94102
Telephone: (415) 404-6615
Facsimile: (415) 404-6616
gill@sperleinlaw.com

Attorney for Plaintiff DataTech Enterprises, LLC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| DATATECH ENTERPRISES, LLC, a Nevada Limited Liability Company, | **Case No.: C-12-4500 (CRB)** |
| Plaintiff, | **PLAINTIFF DATATECH ENTERPRISES, LLC'S REPLY TO DEFENDANT FF MAGNAT LIMITED'S RESPONSE TO ORDER TO SHOW CAUSE RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| FF MAGNAT LIMITED d/b/a ORON.COM, STANISLAV DAVIDOGLOV, and JOHN DOE a/k/a ROMAN ROMANOV (an alias); and | Date:    September 11, 2012 |
| Defendants. | Time:    2:00 p.m. |
| | CtRm:   6, 17th Floor |

*The Law Office of D. Gill Sperlein   345 Grove Street   San Francisco, CA 94102   Tel: 415-404-6615   Fax: 415-404-6616*

-i-

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................................... 1

II.   ARGUMENT ............................................................................................................................. 4

    A.    Plaintiff Has a Substantial Likelihood of Proving Personal Jurisdiction over Defendant FF

Magnat. ........................................................................................................................................ 4

    B.    Defendant Is Not Eligible for DMCA Safe Harbor Protections................................. 7

    C.    Plaintiff Has a Substantial Likelihood of Success in Establishing FF Magnat's Liability for

Direct Copyright Infringement. ................................................................................................. 8

    D.    It Is Necessary and Proper to Issue a Preliminary Injunction in This Matter. ...................... 11

    E.    Defendant has Not Established that a Reduction in the Bond Is Appropriate ...................... 14

III.  CONCLUSION ......................................................................................................................... 15

The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA 94102   Fax: 415-404-6616
Tel: 415-404-6615

PLAINTIFF'S REPLY
C-12-4500 (CRB)

1

2

# TABLE OF AUTHORITIES

3

## CASES

4

A & M Records v. Napster, Inc., 239 F.3d 1004 (9th Cir.2001) ..............................................1

5

*Arista Records LLC v. Lime Group LLC,* 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ................................1

6

*Bancroft & Masters, Inc. v. Augusta National, Inc.* 223 F.3d 1082 (9th Cir.) ......................................5

7

*be2 LLC v. Ivanov,* 642 F.3d 555 (7th Cir. 2011) .....................................................................6

8

*Capitol Records, Inc. v. Thomas-Rasset*, 799 F. Supp. 2d 999 (D. Minn. 2011) ...............................13

9

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 289..................6, 13

10

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d. 878, (9th Cir. 2003)....15

11

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) .....................................................10

12

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) ........................................................12

13

Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159 (2d Cir.1971)....................11

14

*Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589 (E.D. Va. 2003) ........................6

15

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund*, 527 U.S. 308, 119 S.Ct. 1961, 144

16

   L.Ed.2d 319 (1999) ............................................................................................................12

17

*Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127 (9th Cir. 2005) .....................................................14

18

*In re USA Commercial Mortg. Co.*, 397 F. App'x 300 (9th Cir. 2010) ...........................................12

19

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F3d 548 (7th Cir. 2001) ..............................4

20

*Kelly v. Arriba Soft,* 336 F.3d 811 (9th Cir. 2003) .............................................................10

21

*Liberty Media Holdings, LLC v. Serge Letyagin d/b/a Sunporno.com*, Case No. 11-62107- CV -

22

   Williams (S.D. Fla. 2001) ............................................................................................6

23

*MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993) .......................................9, 10

24

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218 (9th Cir. 2011) ...............................5

25

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d

26

   781 (2005) ............................................................................................................1, 3

27

*Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77 (2d Cir. 1996) ....................................................14

28

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET
SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

-iii-

*Perfect 10, Inc. v. Talisman Communs., Inc.,* 2000 U.S. Dist. LEXIS 4564 (C. D. Cal.) ................... 13

*Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503 (N.D. Ohio 1997) ............... 10

*Playboy Enters. v. Webbworld Inc.*, 991 F. Supp. 543 (D. Tex. 1997) ................................ 10

*Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361 (N. Cal. 1995) ......... 8, 9

Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304 (C.A.2 1963) ........................... 11

## STATUTES

17 U.S.C. § 501(a) ................................................................................. 8

17 U.S.C. § 512 ................................................................................ 2, 7

17 U.S.C. §101 ................................................................................... 9

17 U.S.C. §512 (i)(1)(A) ........................................................................... 7

17 U.S.C. §512(c)(1)(A) ........................................................................... 8

17 U.S.C. §512(c)(1)(B) ........................................................................... 8

17 U.S.C. §512(c)(2) .............................................................................. 8

Fed. R. Civ. Proc. 4(k)(2) ......................................................................... 4

## OTHER AUTHORITIES

Ben Sisario, *7 Charged as F.B.I. Closes a Top File-Sharing*, N. Y. Times, Jan. 19, 2012 ............. 1, 13

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET
SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

PLAINTIFF'S REPLY
C-12-4500 (CRB)

1

2

## I.   INTRODUCTION

3

Defendant FF Magnat Limited operated <Oron.com> ("Oron" or the "Oron website"), a

4 system that enables and encourages copyright infringement on an astonishing scale.  As with other

5 adjudicated pirate services that came before it including Napster, Grokster, Limewire, and more

6 recently MegaUpload, Oron exists primarily, if not solely, to profit from infringement.  *A & M*

7 *Records v. Napster, Inc.,* 239 F.3d 1004 (9th Cir.2001); *Metro-Goldwyn-Mayer Studios Inc. v.*

8 *Grokster, Ltd.,* 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005); *Arista Records LLC v. Lime*

9 *Group LLC,* 784 F. Supp. 2d 398 (S.D.N.Y. 2011).  The evidence is unmistakable that Oron actively

10

11 fosters the massive infringement that fuels its business.

12

Defendants protest that Oron is not like Napster, Grokster, Limewire, and other notorious

13 infringers.  But the differences make Oron's infringement more egregious, not less.  No earlier pirate

15 service had the temerity to pay users to upload infringing content as Oron does.  Oron's practice of

16 paying uploaders (Oron's so-called "Affiliates") based on how many times their files are downloaded

17 induces the uploading of "popular" (i.e., infringing) content.  Unlike previous adjudicated infringers,

18 which facilitated access to content stored on their users' computers, Defendant physically copies all

19 the infringing content on its own servers and then distributes it to its subscribers.  This not only gives

20 Defendant an unprecedented ability to stop the infringement – an ability Defendant chooses not to

21

22 exercise, but also renders Defendant a direct infringer.  Finally, Defendant's business model is

23 indistinguishable from that of the website Megaupload, which recently was criminally indicted for

24 engaging in the very same conduct as Oron.  *See*, Ben Sisario, *7 Charged as F.B.I. Closes a Top File-*

25 *Sharing*, N. Y. Times, Jan. 19, 2012, at http://www.nytimes.com/2012/01/20/technology/indictment-

26

27 charges-megaupload-site-with-piracy.html.

28

The Law Office of D. Gill Sperlein
345 Grove Street   San Francisco, CA 94102   Fax: 415-404-6616
Tel: 415-404-6615

When the operators of MegaUpload were indicted, Oron saw the writing on the wall and immediately took steps to extract itself from beyond the reach of the U.S. justice system.  It put its affiliate program on a temporary hold, switched from PayPal to a Canadian payment processing company, transferred the registration for its domain name outside the U.S., and tried to transfer any remaining funds from their U.S. PayPal account.  Declaration of Robert Hare in Support of Plaintiff's Motion for Preliminary Injunction (Hare Decl.) at ¶¶7 and 11, Ex A; Declaration of D. Gill Sperlein in Support of Plaintiff's Motion for Preliminary Injunction (Sperlein Decl.) at ¶3, Ex. B.

The uncontroverted evidence proves Defendant is liable for the same reasons as the adjudicated infringers that preceded Defendant: Oron is overwhelmingly used for infringement and little else; Oron's business model depends on copyright infringement to attract users and earn revenue; Oron actively encourages and promotes its users' copyright infringement; Oron has full knowledge of the rampant infringement on its system; and, Oron has the ability to mitigate the copyright infringement but does not, choosing instead to monetize and profit from it.

The core issue in this case is whether Oron is eligible for the "safe harbor" under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  If it is, then Defendant may enjoy conditional immunity from damages (but not from limited injunctive relief).  If it is not, than Defendant bears full responsibility for its infringement.  Here, on facts not reasonably in dispute, Oron cannot meet any of the DMCA's numerous and specific requirements for safe harbor.

First, the DMCA has strict requirements for registration and disclosure of a DMCA "agent" and provides that a service provider is not eligible for any DMCA safe harbor unless and until those requirements are met.  Defendant failed to comply with the DMCA's registration and disclosure provisions at least until June 15, 2011.  Declaration of Davidoglov Stanislav in Support of Oron's Response to Order to Show Cause Re Plaintiff's Motion for Preliminary Injunction (Stanislav Decl.), ECF No. 21-1, at ¶12.  Prior to its alleged compliance, Plaintiff located over 12,000 instances of its

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

copyrighted works being infringed upon on Oron's website.  Declaration of Peter Phinney in Support of Plaintiff's Motion for Preliminary Injunction (Phinney Decl.) at ¶11.  No further analysis of the DMCA affirmative defense for at least 12,000 instances of infringement is required.

Second, Defendant did not reasonably implement a policy of terminating "repeat infringers," as the DMCA requires.  This was not inadvertent as repeat infringers continued to be an important source for procuring new oron.com subscribers.  Instead of terminating these repeat infringers, Oron paid them and continued to pay them even after having received hundreds of complaints of infringement for those users.  Phinney Decl. at ¶¶13-19; Hare Decl. at ¶¶8-9.

Third, service providers with actual or "red flag" knowledge of copyright infringement on their systems are ineligible for DMCA safe harbor.  Defendants plainly had disqualifying knowledge and are not protected by the DMCA.  Each of the infringed works in this action was uploaded multiple times.  Once notified that a work was not authorized to be on its system, Defendant could have used readily available digital fingerprinting technology to prevent all future uploads of the work, but failed to do so.  Phinney Decl. at ¶¶26-32.

Fourth, service providers who have the right and ability to control the infringing activity, while receiving a direct financial benefit from the infringing activity are not eligible for the DMCA's safe harbors.  Defendant had the right and ability to control the infringing activity by implementing effective and cost efficient technologies to block the uploading of movies identified by copyright holders and by implementing an effective repeat infringer policy.  *Id*.  Defendant directly benefited from the infringing activity as its subscribers access to the works.  *Id*. at Ex. F, I, and J.

Finally, service providers who induce infringement (who act with the object of fostering infringement as Defendant did) are not eligible for DMCA safe harbor at all. *Grokster, Ltd.*, 545 U.S. 913.   These DMCA tests are designed to limit DMCA safe harbor to only innocent service providers – those who have no meaningful knowledge of infringement on their systems and who act

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

reasonably to prevent infringement, such as "Apple ("iCloud" and apple.me), Amazon, Google, Hewlett Packard, and DropBox" to whom Defendant disingenuously compares itself.  ECF No. 21 at 1:6-9.  Unlike those providers, Defendant conceived, built, and operated Oron to promote and profit from massive copyright infringement.  Defendant is liable for that copyright infringement, and cannot seek refuge under the DMCA.

## II.   ARGUMENT

**A.  Plaintiff Has a Substantial Likelihood of Proving Personal Jurisdiction over Defendant FF Magnat.**

If FF Magnat is not subject to jurisdiction in any state other than California but has sufficient contacts with the nation as a whole, than under Fed. R. Civ. Proc. 4(k)(2) it is subject to personal jurisdiction in California.  As Defendant has not argued that it is subject to jurisdiction in any other District, the Court must consider all of Defendant's contacts within the U.S. and if those contacts together establish minimum contacts, than jurisdiction in this Court is proper.   A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed and consent to jurisdiction there.  If defendant contends it cannot be sued in the forum state and refuses to identify any other where suit is possible, the federal court is entitled to use Rule 4(k)(2).  *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F3d 548, 552 (7th Cir. 2001).  Defendant made payments (affiliate fees) to individuals throughout the U.S. for uploading content to its servers, it sold subscriptions allowing fast access to the content to thousands of U.S. residents, the infringed content belongs to a U.S. companies, including Plaintiff, and Defendant used a U.S. company to collect the payments from its subscribers.  Defendant inserted itself into the U.S. market and its operation heavily effects U.S. markets.  Hare Decl. *in passim*; Phinney Decl. at ¶¶2-6;

Defendant admits that nearly 12% of its traffic comes from users within the U.S., which makes the U.S. Defendant's largest market.  Sperlein Decl. at ¶2, Ex. A.  Defendant relied on PayPal,

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET
SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

a U.S. company to process payments from and make payments to U.S. residents.  Phinney Decl. at ¶2; Hare Decl. at ¶7.  Defendant had regular contact with Porn Guardian, a U.S. company representing dozens of other U.S. companies, knew its business was impacting U.S. businesses and U.S. copyrights, and knew it could expect to be held accountable for its actions in the U.S.  Phinney Decl. at ¶¶7-12.  Defendant registered a copyright agent with the U.S. Copyright Office and its Terms of Service reference U.S. law.   Stanislav Decl. at ¶¶10 and 12; Ex. B.   Prior to the MegaLoad indictments it registered its domain in the U.S., and whois data for the owner was care of a U.S. address.  Sperlein Decl. at ¶3; Ex. B.  Defendant transferred the registration to avoid U.S. justice.

Each of the cases relied upon by Defendant, either directly *supports* a finding of jurisdiction or can be readily distinguished.   Defendant relies on *Bankroft* for the proposition that the following jurisdictional factors are to be taken into consideration: whether defendant makes sales, solicits or engages in business in the state, serves the states markets, designates an agent for service of process, holds a license, or is incorporated there, *Bancroft & Masters, Inc. v. Augusta National, Inc.* 223 F.3d 1082, 1086 (9th Cir.).  These questions must be asked of the entire U.S.  Defendant's largest market is the U.S.  It clearly solicits and engages in business here and designated a copyright agent here.  In *Mavrix Photo, Inc., v. Brand Technologies*, the Ninth Circuit found that while the requirements of general jurisdiction were not satisfied, the requirements of specific jurisdiction were.   More directly, the Court stated, "we find most salient the fact that [defendant] used [plaintiff's] copyrighted photos as part of its exploitation of the California market for its own commercial gain.  *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011) *cert. denied*, 132 S. Ct. 1101, 181 L. Ed. 2d 979 (U.S. 2012).   In this action, the question is whether oron.com infringed Plaintiff's copyrights as part of its exploitation of the entire U.S. market.  The answer is yes.

Defendant's reliance on *Graduate Management Admissions* is extraordinary.   *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 596 (E.D. Va. 2003).   The defendant in

*Graduate Management Admissions* was a foreign national and after the Court found no jurisdiction based on Rule 4(k)(1)(A), it went on to analyze jurisdiction under the Rule 4(k)(2), finding that although the defendant's contacts were insufficient to confer jurisdiction based on his contacts in Virginia, his systematic and continuous marketing and selling to the U.S. market as a whole made personal jurisdiction proper under Rule 4(k)(2).   The case is precisely analogous to the facts in this case, and like Raju, FF Magant confirmed its intent to serve U.S. customers by selling subscriptions to customers here and paying affiliate fees to U.S. uploaders.  Hare Decl. at ¶7; Phinney Decl. at ¶2. Websites promoting Oron's affiliate program recognized the importance of the U.S. Market.  *Id.* at ¶5; Ex. F.

None of the other cases relied upon by Defendant involved a website directly selling to residents of the jurisdiction or paying residents to provide infringing content.  *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011)(A handful of residents that signed up for a free dating profile and there were no sales transactions); *Liberty Media Holdings, LLC v. Serge Letyagin d/b/a Sunporno.com*, Case No. 11-62107- CV -Williams (S.D. Fla. 2001)(Only involved passive traffic, and there was no allegation of U.S. sales or maintenance of U.S. affiliates).  Defendant's analysis of the effects test mistakenly asks questions of California instead of for the entire U.S., as it must.  Plaintiff can establish specific jurisdiction under this alternative test.   Copyright infringement is an intentional tort.  *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997) *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998).  Defendant expressly aimed its wrongful conduct at U.S. Copyright holders, knowing they would be harmed in the U.S.  Defendant received 600,000 takedown notices for content belonging to U.S. companies.  Plaintiff marketed its website and received sales from U.S. residents.  Defendant's statement that there is no allegation that infringing

material was loaded by a resident of California is wrong.  It is very likely that California residents uploaded content and it is certain that residents of the U.S. did so.  Hare Decl.; Phinney Decl. at ¶2.

## B.  Defendant Is Not Eligible for DMCA Safe Harbor Protections.

Defendant claims it took measures to reduce infringement on its network.  However, taking *some* measures to prevent infringement is not enough[1].  The DMCA provides safe harbor for copyright infringement only under very specific circumstances.  Under subsection 17 U.S.C. §512

> "[t]he limitations on liability established by [the DMCA] shall apply to a service provider only if the service provider [...] has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. §512 (i)(1)(A).

Defendant allowed repeat infringers to continue uploading infringing content even after receiving multiple takedown notices.  Phinney Decl. at ¶¶13-19, Ex. H; Hare Decl. at ¶8-9. Defendant continued to pay website affiliates, even after receiving takedown notices for material indexed through their websites.  *Id.*; Phinney Decl. at ¶¶20-25.  It is particularly appropriate to deny a safe harbor defense where Defendant continued to rewarded repeat infringers by paying them commissions.

Also, Defendant failed to register an agent for receipt of copyright infringement claims.  FF Magnat copied, stored, and distributed at least 12,417 separate Plaintiff owned files before it registered an agent.  Phinney Decl. at ¶11.  Even if Defendant were eligible for DMCA protection for infringements that occurred after it registered its agent, which it is not, it is not eligible for the infringements that occurred prior to registering an agent.  17 U.S.C. §512(c)(2).

---

[1] The fact that Defendant's Terms of Service are merely "lip Service" is clear by the statement that it will not permit pornography, yet it allows pornography and pays affiliates who upload only pornography.

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET
SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

Defendant also failed to qualify for DMCA safe harbor protection because it knew specific films were infringing and failed to prevent further infringement of those films [17 U.S.C. §512(c)(1)(A)] and it had the right and ability to control the infringing conduct while receiving a direct financial benefit there from.  17 U.S.C. §512(c)(1)(B).

**C.  Plaintiff Has a Substantial Likelihood of Success in Establishing FF Magnat's Liability for Direct Copyright Infringement.**

The Copyright Act is a strict liability statute.  "Infringement occurs when a defendant violates one of the exclusive rights of the copyright holder. 17 U.S.C. § 501(a)."  *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361, 1367 (N. Cal. 1995).  Plaintiff merely needs to prove a substantial likelihood of success in establishing ownership of the copyrights or of an exclusive license of the copyrights for the infringed titles.  DataTech Enterprises, has conclusively show that it holds an exclusive license to identified infringed works and has shown a substantial likelihood that it will establish it holds an exclusive license to additional works.  Declaration of Lance Blundell in Support of Plaintiff's Motion for Preliminary Injunction (Blundell Decl.) at ¶¶3-5.

Defendant has not denied, nor could it, that each of Plaintiff's works was reproduced, sold, and distributed precisely in the manner Plaintiff described in its Complaint.  Knowing it cannot deny the infringement occurred, Defendant relies on an ill-fated DMCA defense for which it clearly is not eligible.   The fact that Defendant developed its system in an attempt to remain willfully bind to the infringing nature of the content it purchases (via affiliate fees) and sells (via subscriptions) does not diminish Defendant's liability. Defendant's infringement of those works is conclusively established.

In *MAI Sys. Corp. v. Peak Computer*, Defendant argued that loading software to it computer's random access memory (RAM) did not constitute infringement because the copy was not "fixed."  *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993)  The Ninth Circuit disagreed, holding that "copying" occurs when a computer program is transferred from a permanent storage

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET
SAN FRANCISCO, CA 94102    FAX: 415-404-6616
TEL: 415-404-6615

device to a computer's RAM".  *Id.* at 518; *See also*, 17 U.S.C. §101.  Here the copies of Plaintiff's works were sufficiently "fixed" on Defendant's servers and were capable of being "perceived, reproduced and otherwise communicated".  In *Religious Technology Center v. Netcom*, the court considered whether the operator of a computer bulletin board service ('BBS'), and the internet access provider that allowed the BBS to reach the Internet, should be liable for copyright infringement committed by a subscriber of the BBS."  *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.*, 907 F. Supp. 1361 (N. Cal. 1995)("*Netcom*").  In finding that the Internet access provider had not directly infringed plaintiff's works, the court noted that Netcom automatically forwarded infringing files from subscribers onto the Usenet and only *temporarily* (11 days) stores copies on its system.  *Id.* at 1367.  The court noted that Netcom's actions were necessary to having a working system for transmitting Usenet postings to and from the Internet.  Thus the court ruled that under those circumstances, the defendant must engage in some further volitional element in order for the copying to the hard drive to be considered a direct infringement.  *Id.* at 1382.

In *CoStar Group, Inc. v. LoopNet, Inc.*, the Fourth Circuit Court of Appeals further examined the principles set forth in *Netcom*, writing, "[w]hen an electronic infrastructure is designed and managed as a conduit of information and data that connects users over the Internet, the owner and manager of the conduit hardly "copies" the information and data in the sense that it fixes a copy in its system of more than transitory duration.  Even if the information and data are "downloaded" onto the owner's RAM or other component as part of the transmission function, that downloading is a temporary, automatic response to the user's request, and *the entire system functions solely to transmit the user's data to the Internet*.  Under such an arrangement, the ISP provides a system that automatically transmits users' material *but is itself totally indifferent to the material's content*."  *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550-551 (4th Cir. 2004)(*Emphasis added*).  Neither the *Netcom,* nor the *CoStar* court based their opinions on automation, but rather on the

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

PLAINTIFF'S REPLY TO RESPONSE TO ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION  C-12-4500 (CRB)

The Law Office of D. Gill Sperlein
345 Grove Street   San Francisco, CA 94102   Fax: 415-404-6616
Tel: 415-404-6615

1    copier's interest and exploitation of the content.  Here, Defendant is not content agnostic as in

2    *Netcom* or *CoStar*, and it is not merely holding files on its servers long enough to pass them on to

3    other users.  The files are maintained indefinitely specifically so that Defendant may sell access to

4    them.  Further, Defendant rewards individuals who upload the popular content Defendant profits

5    from, i.e. the type of content that usually is copyrighted and exploited by the copyright holder.

6

7          In *Playboy v. Webbworld*, defendants operated www.netpics.com, a website through which

8    subscribers could view adult images.  *Playboy Enters. v. Webbworld Inc.*, 991 F. Supp. 543 (D. Tex.

9    1997).  Through an entirely automatic process, defendants developed software that scanned adult

10   oriented Internet newsgroups, located digital images, and copied them to its servers.  Subscribers

11   could view the full-sized images residing on defendant's servers or download those images to their

12   home computers.  Relying in part on *MAI*, and differentiating the facts from *Netcom*, the Court found

13   that these actions constituted a direct infringement of plaintiff's works.  *Id. at*  551.  Webbworld

14   "reproduced" the works by copying them to its hard drives and "distributed" them by allowing its

15   subscribers to download them.  *Id.*; *See also, Kelly v. Arriba Soft,* 336 F.3d 811 (9th Cir. 2003)(direct

16   infringement where search engine stored and displayed results in the form of thumbnail images, but

17   defendant's actions were fair use for reasons which do not apply here).  Similarly, the defendant in

18   *Playboy v. Hardenburgh* encouraged users to upload adult photographs which it in turn made

19   accessible to the subscribers of its BBS.  *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*, 982 F.

20   Supp. 503 (N.D. Ohio 1997).  The court found direct infringement where defendant had a policy of

21   encouraging subscribers to upload files, including adult photographs." *Id.* at 513.  Defendant in the

22   matter before the Court went even further than the defendant in *Hardenburgh* by encouraging

23   individuals who supply the infringing material through affiliate payments.

24

25         With no support, Defendant equates volition with choosing, posting, or indexing material.

26   Such a definition is at odds with all prior case law and would turn the strict liability nature of

27

28

copyright infringement on its head.  Moreover, although Defendant may not have selected or indexed the material, it outsourced those jobs to others and paid them to do those jobs.

Even if Defendant's acts were not sufficient to establish direct infringement of Plaintiff's works, which they were, Defendant is clearly secondarily liable for copyright infringement. Defendant contributed to the infringement by providing the network necessary for infringement, induced others to infringe by paying them to do so, knew specific films were infringing  and failed to prevent further infringement of those films.  *See*, *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)(contributory infringement).  It had the right and ability to control the infringing conduct while receiving a direct financial benefit from the infringement.  *See*, *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (1963)(vicarious infringement).

**D.  It Is Necessary and Proper to Issue a Preliminary Injunction in This Matter.**

Plaintiff has shown a substantial likelihood that it can establish each of the facts required to prove its copyright infringement claims.  Jurisdiction is proper, Plaintiff owns an exclusive license in the works, Defendant copied and distributed the works, and Defendant has no viable DMCA defense. Plaintiff will be irreparably harmed because the continued infringement of its works will permanently devalue its works [Declaration of Chris Ward in Support of Plaintiff's Motion for Preliminary Injunction at ¶7] and Defendants will complete their efforts to remove assets from the U.S. and out of the reach of this Plaintiff and this Court.  The operation of an illegal business should not be considered when evaluating the balance of equities.  Enforcement of copyright laws is in the public interest.  *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1066 (7th Cir. 1994).

Defendant acknowledges that it is proper to freeze particular property (including money assets) that may become the subject of equitable relief if the Plaintiff prevails.  *In re USA Commercial Mortg. Co.*, 397 F. App'x 300, 306 (9th Cir. 2010)(distinguishing the facts from *Grupo*

The Law Office of D. Gill Sperlein
345 Grove Street   San Francisco, CA 94102   Fax: 415-404-6616
Tel: 415-404-6615

*Mexicano de Desarrollo, S.A. v. Alliance Bond Fund,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)).   However, Defendant then refers to the equitable relief available to Plaintiff as "minimal".   Defendant either is engaged in a charade, or it grossly misunderstands what is at stake.   Though Defendant's infringing operation may have extended far beyond its infringement of Plaintiff's copyrights, it also earned enormous revenue from its operation.   Regardless of whether the infringement of Plaintiff's works was minimal compared to Defendant's massive amount of infringement, the profit gained from the infringement of Plaintiff's works alone far exceed any amounts currently held in Defendant's U.S. or Hong Kong accounts.   Only a small amount apparently remains in Defendant's PayPal account, which it has not used to process payments for the last nine months.   Hare Decl. at ¶7.

Defendant infringed hundreds of Plaintiff's works with each being uploaded on to Defendant's website multiple times to the extent that more than 40,000 copies were uploaded, discovered, and removed.   Even if only one person downloaded each separately uploaded movie, oron.com subscriptions (illicit profits) attributable to them will reach hundreds of thousands of dollars.   But that is only a fraction of the story.   For each instance a movie was uploaded, it was available for unlimited worldwide downloading.   The amount of actual profit earned by Defendant from its exploitation of these movies is staggering and easily exceeds millions of dollars.   All of these funds should eventually be equitably disgorged from Defendant and returned to Plaintiff.

Only as an example, if Plaintiff were to elect to receive statutory damages in lieu of the equitable disgorgement it seeks, it would be entitled to up to $150,000 per work based on Defendant's willful actions.   For the 418 titles currently identified by certificate number, statutory damages could reach over sixty-two million dollars.   Even if each work only earned Defendant

$10,000, illicit profits will reach beyond $4 million[2]. If Defendant believes that such figures represent minimal equitable relief, than the assets it holds worldwide must be truly astronomical. If these figures seem hard to believe they should not as infringing operations like Defendant's generate enormous amounts of illicit profits. In the MegaUpload case, the indictment accused the site operators of causing $500 million in damages and of collecting $175 million in illicit profits. Approximately $50 million in assets were seized. Ben Sisario, *7 Charged as F.B.I. Closes a Top File-Sharing*, N. Y. Times, Jan. 19, 2012

Defendant has not disputed that it earned all its revenue from oron.com, the infringing website. Plaintiff has provided evidence that Defendant's revenue came from the sale of its copyright registered works on that site. Having established those facts, the burden shifts to Defendant FF Magnat to offer evidence that any revenue it holds comes from sources other than from the sale of Plaintiff's works. The law is clear on this point. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 USC 504(b). Defendant has not shown it is able or willing to do so.

Defendant then turns to the unsupportable argument that there is no evidence that Defendant will dissipate assets. Defendant's own statements foretell what will happen should the court unfreeze the assets that rightfully belong to Plaintiff. Defendant relies on the HSBC letter to prove it did not convert its Hong Kong dollars into gold, but in so doing makes clear that it regularly converted assets to other foreign currencies. Gold, Euros, or Hryvnia, it makes no difference; Defendant transfers

---

[2] The value of intellectual property generally and adult content specifically cannot be denied. *Capitol Records, Inc. v. Thomas-Rasset*, 799 F. Supp. 2d 999, 1001 (D. Minn. 2011)(Jury awarded $62,500 per infringed song); *Columbia Pictures*, 259 F.3d at 296 ( Ninth Circuit affirmed an award of $20,000 per willful infringement of TV shows); *Perfect 10, Inc. v. Talisman Communs., Inc.,* 2000 U.S. Dist. LEXIS 4564 at 11. (C. D. Cal.)(Court awarded $100,000 for willful infringement per erotic photograph; *Webbworld*, 968 F. Supp. at 1176 (E.D. Tex. 1997)(Court awarded $5,000 per erotic photograph.)

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

money into its Hong Kong bank account only long enough to convert it to foreign currencies and distribute it around the world. To be clear, the only part of FF Magant Limited's company in Hong Kong is *one* of its bank accounts. Its registered office is a location used simply to establish a Hong Kong address for the purpose of opening a bank account and appearing to be based in Hong Kong. There is only one staff member in the office and the sign on the signboard read "Intershore Consult (Asia) Limited. Affirmation of Li Hon Ki at ¶3. Intershore Consult is a company that specializes in setting up offshore companies and bank accounts in such infamous locations as the Seychelles and Pananma. Sperlein Decl. at ¶4, Ex. C. Davidoglov Stanislav claims he is the owner of FF Magnat Limited, but apparently lives somewhere in the Ukraine. Stanislav Decl. at ¶2. In previous litigation he claimed to live in Yalta, but he signed his declaration in Chisinau, Moldova. *Id.*

When MegaUpload was indicted, Defendant put its affiliate program on hold, switched its domain name registration out of the U.S., charged to a non-U.S. payment processor and apparently transferred the ownership of the company to Mr. Stanislav in the Ukraine. There can be little doubt that if allowed to, it will move all assets to accounts which Plaintiff is not likely to locate. Courts routinely issue preliminary injunctions freezing defendants' assets in circumstances like this one. *See, e.g.*, *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996); *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1141 (9th Cir. 2005) ("district court did not abuse its discretion by concluding that the Hendricks would face a significant threat of irreparable injury if a preliminary injunction did not issue to prevent the Bank from honoring Mutual's draw"). *See also, In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994); *Liberty* at EFC No. 11, Order and No. 13 Amended Order.

**E. Defendant has Not Established that a Reduction in the Bond Is Appropriate**

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

THE LAW OFFICE OF D. GILL SPERLEIN
345 GROVE STREET   SAN FRANCISCO, CA 94102   FAX: 415-404-6616
TEL: 415-404-6615

In an asset freeze injunction, "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction"). *See*, *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d. 878, 882 (9th Cir. 2003).   Defendant's could easily recommence their infringing operation at any moment.   Indeed evidence suggests they intend to.  Hare Decl. at ¶13. Part of the injunctive relief Plaintiff seeks, is simply that Defendant comply with copyright laws. The injunctive relief seeking to freeze assets so that the Court may expunge illicit profits and equitably return them to Plaintiff causes no harm, as Plaintiff's claims clearly far exceed any amounts Defendant currently admits to holding.    Defendant has the burden to prove hardship, yet it refuses to provide any financial data.  Evidence shows that the money in the PayPal account may not even be a significant amount of assets the Defendant controls, as Defendant has not used PayPal to process payments since the beginning of 2012.  Hare Decl. at ¶7.  To the contrary, data show, and Defendant admits, that it transferred money to Hong Kong, where it converted it to foreign currencies, spreading it around the globe.  The Court should require Defendant to produce a list of its bank accounts with current statements before granting any change in the bond or additional relief from the asset freeze.

### III.    CONCLUSION

Defendants illegally reproduced, sold, and distributed unauthorized copies of the Plaintiff's copyrighted materials for profit.  Defendants' conduct is patently indefensible.  It immediately and irreparably harms Plaintiff.  The Court should grant Plaintiff's Motion for Preliminary Injunction.

Dated: *September 10, 2012*                    Respectfully submitted,

                                        */s/ D. Gill Sperlein*

                                        D. Gill Sperlein
                                        The Law Office of D. Gill Sperlein
                                        Attorney for Plaintiff DataTech Enterprises, LLC,