Pages 1 – 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

DATATECH ENTERPRISES, LLC, a      )
Nevada Limited Liability Company, )
                                  )
            Plaintiff,            )
                                  )
  vs.                             ) NO. C. 12–04500 CRB
                                  )
FF MAGNAT LIMITED d/b/a/          )
ORION.COM; STANISLAV DAVIDOGLOV,  )
and JOHN DOE a/k/a/ ROMAN ROMANOV )
(an alias),                       )
                                  ) San Francisco, California
            Defendants.           ) Tuesday
                                  ) September 11, 2012
_____    ) 2:09 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**          Krieg Keller Sloan Reilley & Roman LLP
                           555 Montgomery Street, 17th Floor
                           San Francisco, CA  94111
                           (415) 249-8330
                           (415) 249-8333 (fax)
                    BY:  **KENNETH E. KELLER**
                         **MICHAEL D. LISI**


**For Defendant**s         The Law Office of D. Gill Sperlein
                           345 Grove Street
                           San Francisco, CA  94102
                           (415) 404-6615
                           (415) 404-6616 (fax)
                    BY:  **D. GILL SPERLEIN**


Reported by:  Lydia Zinn, CSR #9223, RPR, CRR
Official Reporter – U. S. District Court

```
 1           THE CLERK:  Case C. 12-4500, Datatech Enterprises
 2  versus FF Magnat, Limited.  Appearances, counsel.
 3           MR. KELLER:  Good afternoon, your Honor.  Ken Keller
 4  and Michael Lisi, specially appearing for the defendant
 5  FF Magnat, d/b/a Oron.com.
 6           MR. SPERLEIN:  Good afternoon, your Honor.
 7  D. Gill Sperlein appearing for plaintiff Datatech Enterprises,
 8  LLC.
 9           THE COURT:  So I think this is on for a motion for
10  preliminary injunction.  Right?
11      And it seemed that the issue that I have to satisfy
12  myself -- I mean, there are a number of other issues, but the
13  one I want to discuss this morning -- this afternoon, rather --
14  is the question of personal jurisdiction, because I think we
15  all agree that, in connection with a preliminary injunction,
16  there must be a reasonable probability of success upon the
17  question of jurisdiction.  I would have to so find.  And
18  that's -- I think that's pretty elementary.
19      Now, the test is whether Magnat's contacts with the
20  United States as a whole -- not just California -- would
21  satisfy due process.  Isn't that -- and that's the case of
22  Holland America Line, 485 F. 3d.
23           MR. KELLER:  I think that's right, your Honor.  I
24  think they're pursuing jurisdiction under 4(K)(2) --
25           THE COURT:  Right.
```

1            **MR. KELLER:**  -- and that line of cases.  We don't

2    necessarily concede that, you know, that's the appropriate

3    test; but that's the test that they're proceeding under.

4        So I think the inquiry is, you know:  What's the degree to

5    which Oron.com, for want of an easier phraseology, has the

6    requisite contacts with the United States?  So --

7            **THE COURT:**  And isn't the test, then -- the test set

8    out in *Brayton Purcell*, 606 F. 3d. 1124, as to the component

9    parts of what one must find in connection with personal

10   jurisdiction to warrant a finding?  That's the argument, as I

11   understand.  And that's the test.

12           **MR. KELLER:**  I think that's right.

13           **THE COURT:**  And then Magnat comes in.  And here are

14   the points I think that they make.

15       They say about 12 percent of Magnat's website traffic came

16   from the United States; and, according to a website that

17   analyzes Web traffic patterns, the United States was the

18   country with the largest share of Magnat's Web traffic.

19       Magnat registered a copyright agent with the

20   U. S. Copyright Office.

21       Magnat's terms of service on its website refer to U.S. law.

22       Magnat used PayPal, a U.S. company providing Web payment

23   services to process transactions with customers.

24       Magnat used Porn Guardian, a U.S. company, to protect U.S.

25   copyright holders from illegal use of Magnat's website.  And

1  Porn Guardian notified Magnat over 40,000 times of files that

2  violated Datatech's copyrights.

3      And Magnat registered its domain name with a United States

4  domain register for some time.

5      Those are the indicia.  Maybe there's some others.

6          **MR. SPERLEIN:**  Just a couple of clarifications, which

7  I'm sure they'd want to point out here.

8      FF Magnat did not engage Porn Guardian.  Porn Guardian is a

9  company that's engaged by the plaintiffs, copyright holders --

10         **THE COURT:**  I see.

11         **MR. SPERLEIN:**  -- to cut -- to look for other

12  infringing material, and then contact companies like I --

13         **THE COURT:**  Did they use them?

14         **MR. SPERLEIN:**  Did -- yeah.  They were in constant

15  contact.  They offered them tools, so that they could take

16  infringing materials directly down.

17         **THE COURT:**  But Magnat used them?

18         **MR. KELLER:**  No.

19         **THE COURT:**  No?  That's not in the --

20         **MR. KELLER:**  I think what Counsel's saying is correct,

21  your Honor, which is -- it's somewhat ironic.  One of the

22  things that my client did do as part of its enforcement

23  procedures was to allow access to Datatech.  And they

24  designated Porn Guardian.  So we gave them access to our

25  website -- the entirety of our website -- so that they could

1    look for infringing content, because obviously, we don't

2    control that.  So we didn't employ or engage Porn Guardian --

3              **THE COURT:**  I see.

4              **MR. KELLER:**  -- but we gave them access to our site.

5       And so as part of our compliance program or our program

6    against infringers, now the argument --

7              **THE COURT:**  Right.

8              **MR. KELLER:**  -- is made that because we did that, we

9    have somehow subjected ourselves to the jurisdiction of the

10   United States.

11             **THE COURT:**  Well, I mean, that's one point among other

12   points.

13             **MR. KELLER:**  Right.

14             **MR. SPERLEIN:**  I'll try to stick with the question of

15   jurisdiction for right now.  So we'll get into those issues,

16   I'm sure.

17             **THE COURT:**  Yes.

18             **MR. SPERLEIN:**  But yes.  I think otherwise, the

19   indicia are clearly there.

20      One other point, though, your Honor.  There is evidence

21   from the Robert Hare declaration that shows that, as a resident

22   of Florida, he was one of the affiliates that Oron actually

23   paid, when they made sales from memberships, for material that

24   Mr. Hare uploaded in California.  They gave a portion of that

25   money back to Mr. Hare.

```
 1      Now, that's one example of one person.  We know there are

 2 many throughout the United States.  We don't have that proof

 3 yet.  It's early in discovery, but we have no way of getting

 4 it.  It's all in their hands; but through Porn Guardian, they

 5 reached out to this man.  And he was willing.  Even though he

 6 was part of the kind of infringing process, he's kind of come

 7 clean and said, "Yes, I was part of this.  And Oron made

 8 payments to me here in the United States."

 9           THE COURT:  Okay.  So, Mr. Keller, on the subject of

10 jurisdiction --

11           MR. KELLER:  Sure.

12           THE COURT:  -- these points seem to be more than

13 adequate to demonstrate that there would be a likelihood of

14 success on the issue of personal jurisdiction.  At least, at

15 this point, from what I know, what I've seen in terms of

16 whether a preliminary injunction should be granted, I would so

17 find.  However, I haven't --

18           MR. KELLER:  Yeah.

19           THE COURT:  -- listened to you.

20           MR. KELLER:  Yeah.  Absolutely, your Honor.

21           THE COURT:  Only on the papers.

22           MR. KELLER:  Yeah, if I may, because, as I think we've

23 pointed out, this is not the only case, obviously, that a group

24 of lawyers have been prosecuting across the United States

25 against a variety of companies like Oron.
```

1      Really, where we find ourselves is kind of in, now, the

2  copyright-troll litigation, as opposed to the patent-troll

3  litigation.  And these arguments have been made by these same

4  lawyers in a variety of jurisdictions; and specifically with

5  respect to the *SunPorno* case, which was in Florida.  And we

6  attached the opinion from Sun Florida [sic] -- or from *SunPorno*

7  to our declaration.

8      In that case, they made exactly the same argument under

9  4(K)(2).  And if you look at that decision, at oral argument,

10 Mr. Randazza, who was kind of at the forefront of the lawyers

11 who represent these trolls, said that what they were relying on

12 there was, you know, F.R.C.P. 4(K)(2).  And they were relying

13 upon the fact that there was traffic; in that case, 15 percent

14 of the traffic to the United States.

15     And the Court specifically said there that, you know,

16 merely making an allegation that there's an interactive

17 website -- which is what the allegation is here -- with respect

18 to a certain percentage of traffic to the United States is

19 really not sufficient for there to be jurisdiction.  It may be

20 something that can be proven or disproven at the time of a

21 motion to dismiss, but with respect to the

22 preliminary-injunction stage, which is what it was there, the

23 Court in *SunPorno* made that specific finding, on pretty much

24 the same facts.

25     We cited cases in our brief, your Honor, that -- merely

1  using a company like PayPal is not sufficient for a Court to

2  find that that's sufficient contact with the United States.

3       12 percent of our traffic -- we don't think that is

4  sufficient for the Court to find that that's a sufficient

5  contact with the United States.

6       There has to be a showing that we were specifically

7  directing our conduct to the United States.

8       If you look at our -- and we put it in as Exhibit A to

9  Mr. Stanislav's declaration.  If you look at our website, the

10 first page, there is no direction to the United States.  It's

11 merely someone -- there, there are our terms of service.

12 There, there is our abuse policy.  And someone merely clicks to

13 upload.

14      Unlike other cases, where there is specific touting of the

15 United States, or specific reference to the United, States or

16 specific reference of, "if you take our product, you'll do

17 better in the United States," or otherwise.

18      And I think without that type of specific targeting, that

19 even under 4(K)(2), I think it's an uphill battle for them to

20 prove that we are subjected to the jurisdiction of --

21           **THE COURT:**  But -- but can't -- can't the targeting or

22 the intentional element -- what we're talking about here --

23 can't that be done -- can't that be demonstrated by the

24 operation of a website?

25           **MR. KELLER:**  Well, the cases hold that the operation

1  of a website, an interactive website -- that, in and of itself,

2  is not sufficient.

3      So if you look at the cases where there has been a

4  finding -- it's the *GMAC* case, I believe, where they talk about

5  a website -- there, the person was a represent of India.  And

6  there, he specifically was targeting the United States.  There,

7  he was specifically saying that if you use our product -- and

8  the product, I think, was some testing service -- you know, you

9  will do better than these people in these other countries.

10     So I think the case law is pretty straightforward that

11  merely having an interactive website is actually not sufficient

12  for there to be sufficient contacts with the United States for

13  there to be jurisdiction.

14          **MR. SPERLEIN:**  May I have a few seconds to respond?

15          **THE COURT:**  Yes.  Sure.

16          **MR. SPERLEIN:**  First of all, if I can indulge the

17  Court, I'm not going to stand for someone to sit here and call

18  me names.

19          **THE COURT:**  No, no.  No one's calling anybody

20  anything.

21          **MR. SPERLEIN:**  So -- so I would like him to refrain

22  from that kind of --

23          **THE COURT:**  What?  The word "troll"?

24          **MR. SPERLEIN:**  And I think that diminishes our --

25      Yes.

```
 1        I'm enforcing the rights of my client's copyrights, which I
 2   think is a legitimate thing for --
 3            THE COURT:  I'm looking beyond --
 4        MR. SPERLEIN:  Okay.
 5            THE COURT:  -- whether somebody is a squatter, or a
 6   troll, or any of those other things.
 7            MR. SPERLEIN:  All right.  Okay.  Fair enough.  Let's
 8   stick with the issues.
 9            THE COURT:  Okay.  So it doesn't make any difference.
10   Characterizations aren't --
11            MR. SPERLEIN:  All right.  Well, then I'll ignore
12   them.  If I know you're ignoring them, I'll ignore them.
13            THE COURT:  I'm totally oblivious to these.
14        I mean, I didn't -- you know, Mr. Keller knows I didn't
15   make any comments about whether there was a virtual website,
16   or -- along with his virtual horses and bunnies and everything
17   else he's represented over the years:  Virtual feed, and
18   virtual hay, and virtual water.  And so I didn't say any of
19   those things to him, but he knows that I'm thinking about
20   those.
21            MR. SPERLEIN:  Okay.  I don't know what that history
22   is.
23            THE COURT:  And bananas.  He's also in the banana
24   business.
25            MR. KELLER:  Pineapples, your Honor.
```

1          **THE COURT:**  Yes, we have no bananas.  We just have

2   pineapples.

3          **MR. KELLER:**  Please, let's not denigrate my clients

4   that are fruit.

5          **THE COURT:**  Please go ahead.

6          **MR. SPERLEIN:**  Okay.  We'll get beyond that.

7      The case in Florida -- the *Sun* case -- we're not talking

8   about an interactive website that people can go and look at,

9   and maybe sign up for a free membership.  That site did not

10  involve the sales of any memberships, or there was nothing on

11  the allegations that indicated that.

12      In this case, Oron is selling memberships to United States

13  residents.

14      Beyond that, they're making payments to United States

15  residents to upload content onto their site, to attract people

16  to their site.

17      PayPal is not merely just something that's there to

18  translate -- to transfer their money.  They're -- I mean,

19  that -- all of their money is here in the U.S.  They're doing

20  substantial business here.

21      I don't want to beat this to death, because I think it's

22  pretty clear.  And unless your Honor has some other specific

23  questions --

24          **THE COURT:**  Well, I don't.  I mean, the case --

25          **MR. SPERLEIN:**  I think it's --

1       **THE COURT:**  -- is from Florida.  The case is out of

2  Florida.  That is a District Court.

3       **MR. SPERLEIN:**  It's a District Court.  We love the

4  District Courts.

5       **THE COURT:**  Pardon?

6       **MR. SPERLEIN:**  We love the District Courts.  Good

7  thought comes from the District Court sometimes.

8       **THE COURT:**  But it's not in any way binding on me; is

9  it?

10      **MR. KELLER:**  No, it's not binding on your Honor, but I

11  do think, because --

12     And I'm not attempting to denigrate anybody's --

13      **THE COURT:**  No.  I know.

14      **MR. KELLER:**  -- reputation.  I'm not, your Honor.

15     But there is a reality in this case and these cases that

16  they are filed seriatim.

17     And one of the reasons I referred to Mr. Randazza -- and I

18  know counsel here, in their application for the TRO, he says,

19  "I went back and I looked at the docket in the case against

20  Oron in Nevada."  And I was involved in that case in a Nevada.

21  And if you look at the docket, there are certain things that

22  aren't referenced, one of which is Mr. Randazza's application

23  for fees, where he makes some fairly, I think, significant

24  concessions about the novelty of the questions that were

25  presented; the difficulties that he faced.  And he specifically

1    talks about the difficulty of the jurisdictional question.

2        When we later talk about the substantive issues, we'll talk

3    about that, as well; but I think the reason that *SunPorno* --

4    while not binding upon the Court, it is exactly this fact

5    pattern.  It is this business model which they are attacking.

6    And that's what they're attacking here, is the business model

7    of Oron, and perhaps others.  That's why I do think it's

8    instructive.  I'm not saying it's binding, but -- where you

9    look at a factual finding that they made there.

10            **THE COURT:**  All right.  Well, I think there's adequate

11   showing for jurisdictional purposes.

12       So let's move on to --

13            **MR. SPERLEIN:**  What I would like to talk about?

14            **THE COURT:**  I mean, you know, if one would believe --

15   if one would concede that the dissipation of assets is real, in

16   terms of, ultimately, collectability, then why wouldn't I grant

17   an injunction?  I mean, we have here circumstances that

18   certainly suggest that to allow these funds to be sent offshore

19   will forever preclude --

20            **MR. SPERLEIN:**  And.

21            **THE COURT:**  -- any recovery.

22            **MR. SPERLEIN:**  And to be clear, your Honor, I have

23   been involved -- in fact, I'm in front of Judge Chesney right

24   now in a case that's somewhat similar to this, where they --

25            **THE COURT:**  If it's similar enough, I can give her

1  this case.

2       **MR. SPERLEIN:**  Not that similar.

3       It involves what they call a "tube site," which is a little

4  bit different; more like a YouTube situation, where people

5  upload.

6       And the defendants put up a defense for a while, and then,

7  you know, kept us involved and engaged long enough for them to

8  get all of their assets out.  Then they just threw in the

9  towel.  We're going to get a multimillion-dollar judgment.

10 There are no funds here.  We're never going to see anything

11 from it.  They've set up with a -- now they're -- instead of a

12 dot com, they're a dot EU.  They're continuing their operation.

13      And, you know, clients like mine, who are just little guys

14 here operating in the United States -- they don't have the

15 MPAA's team of lawyers around the world that can go and chase

16 them.  So it really will make a significant difference here.

17      And so I do want to talk about why we believe these assets

18 are not only being transferred, but we also believe that there

19 are assets far and above what they talk about in their PayPal

20 account or in their Hong Kong bank account, and that are, most

21 likely, available to them currently.

22      One of the key issues there -- and I didn't become aware of

23 this until, frankly, I was preparing my reply brief, and spoke

24 with Mr. Hare.  At the beginning of this year, about nine

25 months ago, there was this big indictment of Megaupload by the

1   FBI.  So we're not the only -- not just the copyright trolls

2   that think these type of sites are illegal.  The FBI thinks so,

3   too, under certain circumstances.  There are legitimate ones;

4   but under certain circumstances.  And this is a site that I

5   think falls into those circumstances.

6       So they stopped using PayPal.  They switched to a Canadian

7   payment processor.

8       And Mr. Hare, who was receiving payments for his

9   contribution [sic] to their whole scheme for a number of --

10  for a while -- not that long, he had received a couple payments

11  from PayPal and then after this big change, all of a sudden

12  they said we're not using PayPal anymore.  We're not using

13  AlertPay, also known as "Payza."

14      (Reporter requests clarification)

15          MR. SPERLEIN:  I think it's "Payza."  P-a-y-z-a.  I

16  may not be exactly correct on that.  I can check my records.

17      So I think that shows one of their efforts to withdraw from

18  the United States, understanding that the justice system here

19  is not going to be friendly to them.

20      At the same time, they changed their domain-name

21  registration from a company here in the United States,

22  Network Solutions, in Pennsylvania.  And they switched it to

23  someplace outside of the country.

24      I also understand from Mr. Hare that they kind of suspended

25  their affiliate program for a short time.  It's the affiliate

1  program that kind of got the other ones in trouble; this idea

2  of paying people to upload content that they, in turn, resold.

3      And so they put that on hold, until they kind of got --

4  kind of tried to find the ones that were the most blatant ones,

5  and tried to keep everything back underneath the radar.

6      Then there were these, you know, payments to Hong Kong.

7      Now, they talk about this letter.  And I apologize.  I did

8  not know.  I had never seen this letter from the bank.  I have

9  no doubt that it was part of the *Liberty* case.  There were a

10  lot of documents in that case.  I was in a hurry to get this

11  TRO in, because I saw in that case that an injunction was about

12  to be lifted; they'd reached a settlement; and any funds would

13  likely be gone from the United States forever.  I was under a

14  big hurry.  I didn't get to look at it closely, but I didn't

15  see that, but I don't think it matters.

16      They're saying, "These things that say 'gold transfers' --

17  they're not gold transfers.  They're transfers into any other

18  currency."

19      Well, if they're transferring it into gold, maybe it makes

20  it a little bit easier for them to hide it, but if they're

21  transferring it into Euros or into -- I forget the name of it.

22  I put it in my brief -- the money for the Ukraine, or

23  whatever -- and transferring around the world, it's still going

24  to be far beyond reach of a U.S. litigant, at least, in any

25  meaningful way.  So I really do think that there's substantial

1    evidence that they're transferring these assets.

2        I'm going to -- I know that you have further questions, and

3    you have a line that you want to go through on each of these.

4        I do ask that I have a little bit of time at the end, to go

5    over some key documents that I think --

6            **THE COURT:**  Well, we have the afternoon.

7            **MR. SPERLEIN:**  -- really, really show the involvement

8    of this person who we don't know yet; this John Doe, a.k.a.

9    Roman Romanov; records that have been -- or documents that have

10   been submitted to the record.

11       And I think if I go over them carefully with the Court and

12   take a few minutes to go over those, they really show a level

13   of involvement not only in the banking, but also in these

14   indexing sites.  They're supposed to be completely separate,

15   and not --

16       Their claim is that all we do is let people upload and

17   download.  And if they want to download faster, they can pay us

18   money to do that; but they are also intimately involved --

19           **THE COURT:**  Okay.

20           **MR. SPERLEIN:**  -- in creating these sites that list

21   all of the movies that are available; providing box covers,

22   descriptions, and whatnot; and showing people.

23       So if this is an appropriate time to do that, we can turn

24   to it.

25           **THE COURT:**  Well, I don't think so.

```
 1        I think I want to talk about the appropriateness of a
 2   remedy of requiring the assets to be attached --
 3             MR. KELLER:  Yeah.
 4             THE COURT:  -- essentially, because you can't -- you
 5   know, you start with the proposition that a prejudgment
 6   attachment is inappropriate.  The exception is when equitable
 7   relief is sought, and what you're actually seeking is a
 8   disgorgement of funds that were basically somebody else's.  So
 9   it's not a damage assessment; it is a disgorgement of what was
10   wrongfully taken.
11        That's the argument that plaintiff is making.  And I think
12   that that's the one that you have to address, Mr. Keller.
13             MR. KELLER:  Absolutely.
14        And again, I don't mean to mix my metaphors and beat a dead
15   horse, but this -- let me start first with this reference to
16   *Megaupload*, because they've done it in the complaint, and
17   they've done it in this brief.  And they attempt to imply that
18   somehow, Oron is a criminal; that somehow, Oron has been
19   indicted.
20        Well, first of all, that is not the case.  There has never
21   been any criminal investigation of Oron.  There has never been
22   any indictment of Oron.
23        And they trumpet the *Megaupload* case and say, "Well, here,
24   see?  The federal government has targeted Megaupload.  We're
25   just like Megaupload."
```

1    The thing that they don't tell the Court is that the

2  *Megaupload* case is really falling upon its own self.  There's

3  just been -- they cite back to an article in January 2012.

4  Well, the Court in --

5         **THE COURT:**  Well, putting that argument aside, let me

6  ask this question.

7         **MR. KELLER:**  Sure.

8         **THE COURT:**  Let's just say I have a copyright.  And I

9  believe that Jones is infringing my copyright.  And so I sue

10  Jones.

11    And Jones has -- because -- Jones has given his material to

12  Smith.  Okay?

13    Too complicated here.

14    And so I know that Jones is holding the money that

15  otherwise he would pay out to Smith, or somebody else, for that

16  matter; but it's really the money that was the proceeds of the

17  infringement.

18    Aren't I entitled to an injunction prohibiting Jones from

19  dissipating those funds?

20    That is to say, as the person who holds the copyright,

21  aren't they entitled to go to the infringer and say, "If you

22  have money that ought to be mine, you must hold on to it"?

23  Isn't that isn't that just sort of basic?

24         **MR. KELLER:**  Well --

25         **THE COURT:**  Now, you can make the argument that's not

1  what happened here.  That's fine.  I understand that argument.

2       MR. KELLER:  Well, there are several assumptions.  And

3  maybe that's the argument; that that's not what happened here.

4    But the assumptions you're making, first of all, that

5  there's a specific fund of "ill-gotten profits," to use their

6  phraseology, well, again, the problem --

7       THE COURT:  Not a segregated fund.  And I want to be

8  careful when we talk about specifics, because I'm not going to

9  say the infringer's money is in "Pot $X$," and that represents

10 the infringer's money.

11   Because money is fungible, I assume that whatever is the

12 amount that the infringer would have to disgorge is part of a

13 larger amount; is part of a larger amount that wouldn't have to

14 be disgorged.  Now, maybe that larger amount would be subject

15 to some damage claim, and so forth; but the smaller amount --

16 that is, the amount that was the result of the infringement --

17 that would be something that could be attached.

18       MR. KELLER:  Well --

19       MR. SPERLEIN:  And the law says that they have to say

20 what part is not.

21       THE COURT:  Well, that's right.  And we'll get to

22 that.  And that's why I sort of think that the short answer to

23 all of this is:  The moneys are attached, or prohibited from

24 being transferred, subject to you coming in and saying, "If

25 they were right in their claims, they would be entitled to $X$,

1   and therefore -- and wouldn't be entitled to *Y*; *Y* being greater

2   than *X*.   And therefore, the *X* has to be segregated out and

3   held, and the *Y* is free for transfer purposes."

4         **MR. KELLER:**   But to address your question, first you

5   said do I not agree, in your hypothetical, that --

6         **THE COURT:**   An infringer is entitled to --

7         **MR. KELLER:**   -- is entitled to freeze --

8      Well, no.

9      -- to freeze those assets.

10        **THE COURT:**   Yeah, which would be subject to

11  disgorgement.

12        **MR. KELLER:**   Right.   And I don't agree that that is

13  the situation.

14     When you look at the *Grupo Americano* [sic] case, there, the

15  Supreme Court -- which they don't address in their brief -- the

16  Supreme Court says there that even though you have a defendant

17  who is potentially insolvent, which was the situation there,

18  where someone is seeking a money judgment --

19     And that's really what they're seeking here.   I agree

20  disgorgement is what they're talking about.

21     -- that you do not automatically get a freeze in those

22  assets.

23        **THE COURT:**   By the way, didn't you just answer?   You

24  say "insolvent," which would mean they can't.   They don't have

25  a pot of money, I would guess.

1           MR. KELLER:  No.  There was money there.  It was notes

2    that could be seized.

3        And what the issue was there:  If we let you go forward,

4    you'll dissipate the assets, you'll sell off the funds, and

5    therefore, you won't have them.

6        And the problem in this case --

7           THE COURT:  Sorry.  What case is that?

8           MR. KELLER:  That's the *Grupo Americano* [sic] case;

9    the United States Supreme Court case that we cite in our

10   brief --

11          THE COURT:  All right.

12          MR. KELLER:  -- which is decided post *Estate of*

13   *Marcos*.

14       I've got it, your Honor.  <u>527 U.S. 308</u>.

15          THE COURT:  308.  Right.

16          MR. KELLER:  And, see, I think when you look at the

17   line of cases, and where your Honor was talking about

18   dissipation of assets, really what the Court has to find is

19   that there is some consistent pattern and practice and/or

20   fraudulent scheme to dissipate assets, because in the -- and

21   that's where, in this case -- and again, it's the reference

22   back to the case in Nevada.  What they rely upon there is the

23   affidavit filed in Nevada by Mr. Randazza.

24       The evidence that they rely upon for this scheme of

25   dissipation is twofold.

1      One is they say, "Well, there's this PayPal account.  And

2    there was a transfer from this PayPal account, which now

3    becomes multiple payments," which is actually not the case.

4      There was a single transfer from the PayPal account here in

5    the United States to my client's account in Hong Kong.  My

6    client is a Hong Kong business, transacting business worldwide,

7    some of which is here in the United States.  I don't see what

8    in any respect is nefarious about a Hong Kong company

9    transferring money from an account here in the United States to

10   its bank in Hong Kong.

11     When you look at that e-mail, again, they don't say how

12   they got the e-mail.  Mr. Stanislav put in a declaration saying

13   he never authorized it.  Whether it was hacked or otherwise, we

14   don't know.

15     So you have a single business transaction.  The amount that

16   was subject to that transaction was about a hundred thousand

17   dollars.  You have a multimillion-dollar, worldwide company.

18   Again, I don't think there's anything nefarious about that

19   company making a transaction whereby it's transferring money to

20   its Hong Kong bank.

21     The second thing they rely upon is this gold transaction.

22   And, again, I'm not attempting to blame Counsel, but when he

23   relies upon a statement made in the case in Nevada that there's

24   evidence that there were gold transactions, and that therefore,

25   this is an indicia that we're moving money around the globe --

1  well, as we pointed out our brief, there is actually a letter

2  from the Hong Kong bank, HSBC, saying, "No, no.  That's just a

3  general category.  There were no gold transactions whatsoever

4  with respect to Oron.com."

5      All they're saying is, "Yeah, you moved money to Hong Kong.

6  And the money's transferred into Hong Kong currency."

7      I don't think there's any nefarious there.

8          **THE COURT:**  I don't think -- I don't know that it's

9  the nefarious nature of it, because I think that -- it's not

10  the nefarious nature of it, if it is nefarious.

11     And I understand your point that you're sending money

12  abroad.  There's every likelihood that -- especially in markets

13  that are in such great state of flux, that there will be some

14  tendency, based upon economic concerns, to change currencies;

15  to put it in common currencies; to do all sorts of things with

16  currency.

17     Now, but that's not, I don't think, quite his point.

18     I thought his point was:  This makes it even more

19  difficult, in terms of satisfaction of any ultimate remedy

20  that's ordered by the Court.  It makes it more difficult to

21  capture.

22         **MR. KELLER:**  No.  I think that the point that was

23  being made is --

24         **THE COURT:**  Yeah.

25         **MR. KELLER:**  -- that, in order to satisfy the cases

 1   which authorize an asset freeze, what the Court has to

 2   determine is that there is a fraudulent scheme -- whether we're

 3   going to call it "nefarious" -- whether there is a fraudulent

 4   scheme to dissipate assets.

 5           **THE COURT:**  Well, it says -- I'm now citing from

 6   *Grupo*.  Oh, sorry.  Maybe I'm not.  I'm citing from *Allstate*

 7   *Insurance Company*, from your brief.

 8           **MR. KELLER:**  Mm-hm.

 9           **THE COURT:**  Anyway, following *Grupo*, you say, "Even

10   under the most lenient standard for claims seeking equitable

11   relief, the plaintiff would have to show a likelihood of

12   dissipation of the claimed assets or other inability to recover

13   monetary damages if relief is not granted."

14     And the question is:  When you start changing funds into

15   various currencies, including the possibility of changing it

16   into gold, I suppose, or Euros, or Hong Kong Dollars, or

17   something like that, is there a likelihood -- is there

18   basically an inability to collect?

19     And I think that that may very well be the case.

20           **MR. KELLER:**  If you look at the quote from our

21   brief --

22           **THE COURT:**  Yeah.

23           **MR. KELLER:**  -- what it talks about, and why *Allstate*

24   is cited, is because in the instance where a Court is going to

25   do that, "This standard, narrowly construed" --

1          **THE COURT:**  Mm-hm.

2          **MR. KELLER:**  -- "only exercising their inherent

3  authority to freeze assets, where there is considerable

4  evidence of likely asset dissipation."  You're always going to

5  have this argument that, where I'm potentially a creditor -- a

6  judgment creditor -- that a company that's doing worldwide

7  business can move assets out of this jurisdiction.

8          **THE COURT:**  Yeah.

9          **MR. KELLER:**  That argument is always going to be there

10  in every case.

11          **THE COURT:**  Well, I don't know if it was there in

12  *Allstate*, or not, because I don't know the facts of *Allstate*.

13  I don't know if we're dealing with foreign transactions, or

14  not.

15          **MR. KELLER:**  And if you read on, certainly, every

16  creditor would like to freeze its alleged debtor's assets.

17          **THE COURT:**  Yes, but the question is --

18      Let's make it case-specific.  And the case-specific is that

19  this money is going to Hong Kong.

20      You say, "Yes.  It is going to Hong Kong.  That's where we

21  do business."

22      Okay.  That may answer the question of whether the transfer

23  was, quote, "nefarious," or done solely for the purpose of

24  dissipating the assets, there being no other nexus or

25  connection or identifying factor that would justify such a

1    transfer; but as I understand your quote, it doesn't rely

2    solely on the dissipation of the claimed asset.  It relies, in

3    part, on the inability to obtain the assets; of course,

4    dissipation being a part of inability; but it seems to me that

5    by sending it abroad, by changing its currency, you have

6    substantially enhanced the probability of uncollectibility in

7    satisfaction of an equitable remedy.

8        I'm not talking about --

9            MR. SPERLEIN:  And that's -- and that's -- and that's

10   an important point, because that's where it goes further.

11   They're not talking about an equitable remedy.

12           THE COURT:  No, because I think you lose on the other.

13   I think the plaintiff loses on the other.

14           MR. KELLER:  Yeah.

15           THE COURT:  You have to talk about --

16       And actually, the case Mr. Keller cites is an equitable

17   case; isn't it?  I'm reading out of your brief.

18           MR. SPERLEIN:  Certainly the other case they rely on

19   -- U.S.A. Mortgage -- *U.S.A. Commercial Mortgage* --

20   distinguishes itself from *Grupo*, in that we're talking about a

21   pot of money that is -- equitably belongs to plaintiff.

22           THE COURT:  Well, did *Grupo* relate to an equitable --

23   satisfaction of an equitable claim?

24           MR. KELLER:  It did in part, yes.

25           THE COURT:  Was the Supreme Court -- if you want me to

1    look at it, Mr. Keller --

2            **MR. KELLER:**  What the Supreme Court was doing was --

3    the Supreme Court was distinguishing the line of cases, and

4    basically coming to a different conclusion than the one relied

5    upon by the plaintiffs.  Yeah.

6            **THE COURT:**  I'll give you -- I'll give you a reread on

7    *Grupo*.  Okay?

8            **MR. KELLER:**  Okay, but may I just address one final

9    point, where you're talking about --

10           **THE COURT:**  Because I think there's also a

11   Ninth Circuit case that suggests that it is appropriate, and

12   that --

13           **MR. KELLER:**  That's the *Estate of Marcos*, I think.

14           **THE COURT:**  *Estate of Marcos.*

15           **MR. KELLER:**  Well, I understand.

16           **THE COURT:**  It is the --

17           **MR. SPERLEIN:**  I think that's the *U.S.A. Commercial*,

18   397 F. Appendix 300, (Ninth Circuit 2010).

19           **THE COURT:**  Sorry.  Which one?

20           **MR. SPERLEIN:**  *U.S.A. Commercial Mortgage Company*,

21   397 F. Appendix 300, (Ninth Circuit 2010).

22       And I'll admit I haven't --

23           **THE COURT:**  And the cite I have is *Johnson versus*

24   *Couturier*, which is 572 F. 3d. 1067, (Ninth Circuit 2009).

25           **MR. KELLER:**  Your Honor, if I may, may I just respond

1    to one final point that you addressed, which is when you were

2    talking about, well, the reason one needs to do this is because

3    the money will move elsewhere, and they will have no

4    opportunity to collect it elsewhere -- well, these plaintiffs

5    have already gone to Hong Kong and gotten a *Mareva* injunction.

6    They're not without opportunities to go elsewhere to try and

7    collect funds.

8        I'm not saying that injunction is proper; but now what they

9    have already done is they have already gone over to Hong Kong

10   and, quote, "frozen" the accounts over there, as well.

11           **THE COURT:**  Did they?

12           **MR. SPERLEIN:**  Yes, sir.  That was achieved -- where

13   are we today? -- Thursday morning, I believe.

14       Now, but that will dissolve.  Without the preliminary --

15   that's based on your TRO.  And if you don't put into act a

16   preliminary injunction, that will dissolve.

17           **MR. KELLER:**  Oh, I'm not sure that's actually

18   accurate.

19           **MR. SPERLEIN:**  No.  It is accurate.  Well, my

20   attorneys in Hong Kong told me that.  So --

21           **MR. KELLER:**  But the point being, your Honor, I mean,

22   that's a relevant point, because one of the factors --

23           **THE COURT:**  What's the relevant point?

24           **MR. KELLER:**  The relevant point, your Honor, is:  One

25   of the factors you're saying is if I don't freeze this account

1  here in the United States --

2          **THE COURT:**  No, no.  That's --

3      Yes, of course, that's a relevant point; but if you take

4  his argument -- if, in fact, that injunction was issued as a

5  result of my TRO, then I don't know what the independent basis

6  is, but I can tell you if that's what the argument was, if

7  that's what the Judge did, and the TRO dissolves today, then I

8  think -- and I don't issue a preliminary injunction, then that

9  argument's out of window.

10     Now, maybe there's some independent basis.  I'm just

11  saying, Mr. Keller, that you can't -- if -- unless that just

12  didn't occur -- and I believe it did, if that's what counsel

13  tells me.  I believe whatever lawyers say to me on both sides.

14  So if that's what happened, then I think it doesn't show an

15  independent ability to freeze the assets.  That's what I'm

16  saying.

17          **MR. KELLER:**  No, but what the practical effect has

18  been of these seriatim freezing of assets -- it's driven this

19  company out of business.  That's what it's done, because when

20  the first asset freeze is achieved in Nevada, it freezes the

21  money in the PayPal account, and then go over to Hong Kong to

22  freeze the money there.  Ironically, the injunction in

23  Nevada -- I'm sorry -- the injunction in Hong Kong in that case

24  said, "Freeze up to $3 million, but you can distribute money to

25  pay ordinary business expenses and to pay attorneys."

```
 1        But then what happened with the Court in Nevada -- we went

 2   back in and said, "Our lease servers are coming up.  We owe the

 3   money, or we're going down."  And she would not release the

 4   funds.

 5        We went to Hong Kong -- or counsel in Hong Kong went there.

 6   And they said, "Well, because there's a TRO in the

 7   United States, we're not going to dissipate or allow you to

 8   distribute any funds."

 9        The statement in the brief that we shut the website down

10   because we were concerned about infringement -- that's just

11   simply not true.

12              THE COURT:  Okay.  That's another argument, but I

13   mean, sticking with this argument --

14              MR. KELLER:  I think I am.

15              THE COURT:  Tell me, Mr. Keller.  Do you have some

16   idea as to how much is frozen?

17              MR. KELLER:  I think it's about $800,000, I think,

18   your Honor.

19        And I know -- we're grateful you did.  I know you released

20   $125,000 for attorneys fees in this case.

21              THE COURT:  Only to be spent on this case --

22              MR. KELLER:  No, no.

23              THE COURT:  -- not any arrearage.

24              MR. KELLER:  I understand.  And you were absolutely

25   clear in that regard.
```

1        But if we're going down this road -- and I don't know if we

2   are, or not -- but if these funds are remaining frozen, I mean,

3   ironically, Mr. Randazza has an attorney's fees award in Nevada

4   which we can't pay him.  Lawyers in Nevada are owed about

5   $200,000, which, without those funds, we can't pay them.

6   There's an appeal that's been filed.  You can't fund the appeal

7   without the funds.

8        So, I mean, the money there is 800-, I think, or

9   thereabouts.  I don't know if that's after the 125's been taken

10  out, or not.

11          MR. SPERLEIN:  Your Honor, I can only say to this that

12  we know there's at least one account in Canada that probably

13  has substantial amounts of money.  And one of the --

14          THE COURT:  What does that mean, though?  I mean,

15  people use that word all of the time.  And, to a federal Judge,

16  "substantial" means anything over $174,000.  That's my test.

17          MR. SPERLEIN:  Okay.

18          THE COURT:  I just pick that number out of the air --

19          MR. KELLER:  Just random, your Honor.

20          THE COURT:  -- and say that that number is

21  substantial.

22        Anything under 174,000:  Not substantial.

23          MR. SPERLEIN:  Well, we don't know.  And shouldn't we?

24  Shouldn't we, before we decide?  Whether they need additional

25  money to pay lawyers, shouldn't we know if they have 174,000,

1   or otherwise?

2        **THE COURT:**  I don't know what you need to know.

3        I just believe what I need to know is -- I need to have a

4   lot more information if I'm going to start.

5        Assuming I grant the preliminary injunction, I also would

6   do so with the understanding that the defendant can come in and

7   demonstrate, if he can, you know, what funds he needs for the

8   operation of the business, and so forth, and what funds

9   wouldn't be subject to a disgorgement.

10       And that's -- you know, maybe that's where the battle is

11  fought; I don't know.

12       **MR. KELLER:**  Well, ironically, under your TRO, not

13  only did you -- you froze PayPal.  You froze all kinds of

14  accounts, none of which matter anymore, because it's out of

15  business; but you also issued the Order that none of the

16  defendants could distribute money anywhere in the world.

17       So even if there -- I don't know if there's an account in

18  Canada, or not.  Even if there were, under your present TRO, we

19  couldn't go distribute that money, anyway.  Couldn't distribute

20  money in Hong Kong.  I mean, the practical effect of your TRO

21  is a worldwide freeze.  It is.

22       **THE COURT:**  Well --

23       **MR. KELLER:**  And whether the Court intended that or

24  not, that is the practical effect when issue an order that --

25  not only am I freezing a specific account, but I'm saying to

1   the defendants, "You can't move any money anywhere."

2          MR. SPERLEIN:   Your Honor, if these guys are the bad

3   actors that I believe they are, and that I would like to --

4   that I do want to show some more evidence on, your Order,

5   unfortunately, is not going to have any effect on a third party

6   in Canada.  As much as I would love it to, I doubt if it would.

7       And maybe they'll hold those funds based on it.  I sent

8   them a copy of your Order.  I don't know if they'll follow it,

9   or not.

10      If they give that money to -- to defendants, he is

11  required, under your Order, not dissipate those assets; but I

12  don't know if he's going to follow it.

13         THE COURT:   Well, I never know.  I never know whether

14  the orders will be -- at least, initially, whether they'll be

15  carried out.  I mean, I assume they are.  And but if -- if

16  they're not, then that's another issue.  And it's subject to

17  certain remedies; but I think that the Court should not issue

18  injunctions where there is a small likelihood of them being

19  observed.

20      On the other hand, they shouldn't hesitate to issue

21  injunctions if there's a legal basis, a factual basis for it,

22  and there's at least a reasonable expectation that they'll be

23  followed.  That's all I can do.

24      If they're not followed, then there are remedies.  And

25  Mr. Keller's a very straightforward lawyer.  And he's not, you

1    know, as they say --

2           MR. SPERLEIN:  I'm not sure he would advise his

3    clients correctly.

4           MR. KELLER:  I live here a lot in your courtroom here,

5    your Honor.

6           THE COURT:  You always seem to get me.  That's your

7    bad luck, but --

8           MR. KELLER:  No.  And that's why when your Honor said,

9    you know, to be used in this case, we saw that loud and clear,

10   obviously, you know; that the funds that you allowed to be

11   distributed are for lawyers in this case.

12       But as I said, I mean, that's -- the practical effect of

13   the other aspect of your Order is, in essence, a worldwide

14   freeze.

15          THE COURT:  Well --

16          MR. SPERLEIN:  More on that issue, or can we -- I'm --

17          THE COURT:  I don't know that there's anything wrong

18   with a worldwide freeze, as it's described.  I mean --

19          MR. SPERLEIN:  Well, again, your Honor --

20          THE COURT:  I don't know.  I mean, its practical

21   effect may be one thing.  It's -- the terms of the Order are

22   the terms of the Order.

23          MR. KELLER:  Well, the Order was addressed not only to

24   the company, but to an individual, as well.  I mean, we talked

25   this morning about jurisdiction *vis-à-vis* oron.com.  We didn't

1    talk about --

2          **THE COURT:**  Well, on that issue, I think that I should

3    allow some discovery.  We're talking about a John Doe, also

4    known as Roman Romanov.

5          **MR. SPERLEIN:**  Romanov, which sure sounds like an

6    alias to me.  I don't know.  Maybe just people have fancy names

7    like that, but I'm assuming it's an alias.

8          **MR. KELLER:**  I'll tell my partner, Stan Roman, that --

9          **MR. SPERLEIN:**  But his first name isn't "Roman."  And

10   I'll tell you.  I was reading through something, and I saw

11   "Roman."  I thought:  Did I mistype that?  No.  That's the

12   attorney.

13         **MR. KELLER:**  No, you didn't, but I mean --

14         **MR. SPERLEIN:**  Did I?  Did I do a typo on "Roman"?

15         **MR. KELLER:**  I don't know what you're talking about.

16         **THE COURT:**  Anyway, I'm going to allow -- I'm going to

17   allow discovery on that issue; on who is it.

18         **MR. SPERLEIN:**  I have a few -- some of these e-mails

19   that are in the record really show that -- and if the Court

20   would indulge me for maybe five minutes, I can go through a

21   couple of things --

22         **THE COURT:**  Go ahead.  Go ahead.  Go ahead.

23         **MR. SPERLEIN:**  -- that I think really shed a lot of

24   light on Mr. Romanov and the operation of this website.

25      The document I'm referring to is Exhibit E to my

1  declaration in support of alternative service and early

2  discovery.  I have a copy here for you.

3          **MR. KELLER:**  Do you?  That would be great.  Thanks.

4          **MR. SPERLEIN:**  Your Honor, if it's easier for you to

5  just take a copy -- this is just a copy of the exhibits.

6          (Whereupon a document was tendered to the Court)

7          **MR. SPERLEIN:**  It's on ECF:  19.

8      Now, I want to start off by saying these are documents that

9  you pulled from the *Liberty* case.  And I acknowledge that I

10  could not admit these at a trial without some sort of

11  foundation for them, but I think we'll be able to establish

12  that moving forward.

13      And I don't think there's any doubt that these are real

14  e-mails that really transpired between Mr. Romanov, also

15  known -- it's Romanov, with a "v"; sometimes "Romanoff" --

16  o-f-f.  Sometimes "Main Roman" (phonetic) is the name that he

17  uses on his e-mail accounts.

18      And as you flip through this, the exhibit numbers that are

19  there, like Exhibit 2, is actually the exhibit number from the

20  *Liberty* case.  So I don't want you to get confused about that;

21  but if you look at that first one at Exhibit 2, the header

22  there shows that it is from someone named Sven at Oron, and

23  goes to support@oron, which is an e-mail address that

24  Roman Romanov uses.

25      And Roman Romanov, using the e-mail address

1  mainroman@gmail.com, refers to him as, "Hi, Boss."  So I assume

2  that he has some high-level position there.  And he's talking

3  about placing some advertising here.  That's not all real

4  relevant, but towards the bottom of the page it says.  "Note:

5  I cannot deposit money there.  They need the Oron credit-card

6  data."  I'm assuming that's showing that Mr. Romanov is the one

7  that holds the credit-card data for Oron, and is a high-level

8  player at Oron.

9      And then the only thing on the second page there -- and

10 they talk about these campaigns.  And this is a dead horse, I

11 guess; but it talks about a U.S. -- running banner ads that

12 would show up in the United States; but that really just goes

13 to jurisdiction.

14     If we turn to Exhibit 7 -- and I put some green folders,

15 some papers there, so you can get to them quickly -- this is

16 the one that's really kind of incredible.  We talked about the

17 way these sites work.  Oron claims to just have a group of

18 servers where they let people upload content, and they give

19 them a URL.  And then, when they want to come back and look at

20 their content, they can type in a URL; but what really happens

21 is that people upload content, and then they put these URLs on

22 various sites.  And people come, click on those sites, and go.

23 And then, if they want to get the content fast and download it,

24 they buy a premium membership.

25     On this one here -- actually, I'm talking, probably, about

1    the next one.  This one here just talks about -- this is --

2    this has to do with AlertPay.  And it shows in the middle

3    section there that Mr. Romanov is directly dealing with

4    AlertPay.  He's showing that he's in charge of the accounting,

5    and whatnot, to some degree.  Transfers of $45,000 -- I don't

6    know if that's Canadian or U.S -- and 47,000 on the same day.

7    I think that's a substantial amount of money for transfers

8    going back and forth during the day.  So that's -- that's the

9    only point of that e-mail, there.

10          And then if we can turn to the next one, at 22, what this

11   actually shows is that Mr. Romanov is paying moderators of this

12   indexing site -- this Porn BB site -- to make posts on their

13   site that link to Oron.  And then he's giving them the links to

14   Oron.  And he's giving them the box covers and the screen

15   captures that make it possible for people to determine what

16   they want to buy or what they want to download.  This -- both

17   this e-mail and the next one -- he's paying them ten cents a

18   post on these pages to get people to link to Oron, and try to

19   download this content.  It really shows a high level of his

20   involvement, not only at Oron, but in this operation of this

21   indexing site, which is clearly directing people to Oron.

22          Now, this particular indexing site only allows links that

23   go to Oron.  If there are links to a competitor -- competing

24   file server, like FairShare or RapidShare or one of the other

25   ones, they're not allowed.  And he controls that.

1    And then, finally, if we switch to my Exhibit G, which I

2  will also hand you a copy of --

3          (Whereupon a document was tendered to the Court)

4          **MR. SPERLEIN:**  -- this shows Mr. Romanov selling ad

5  space on Porn BB, the indexing site, to Adult Friend Finder,

6  which is a third dating site.  So he's so much in control of

7  this indexing site, that he's selling advertising on that site

8  to a third party.  There's no doubt that this man is fully

9  involved; understands the infringement; and is intimately

10 involved in the infringement.  He's involved in the banking.

11 He's the person that's running the shots.

12    I don't know about Mr. Stanislav -- I cannot say his first

13 name.  Davidoglov Stanislav.

14    Romanov is the guy that's at the -- behind the wheel of

15 this thing.

16          **THE COURT:**  Discovery.  Again, I'm not passing on the

17 merits of the evidence, obviously; but it certainly justifies

18 some further discovery.  And I'm permitting you to do that.

19    You talk about Stanislav for a moment.

20    Mr. Keller, do you represent him?

21          **MR. KELLER:**  At the present time, no.

22          **THE COURT:**  Okay.  So the question is whether to allow

23 substitute service.  And I think the argument is:  Well, there

24 is The Hague Convention.  And one could follow the service

25 protocols in the Hague Convention, but my understanding of

1    The Hague Convention is that it's not obligatory to follow The

2    Hague Convention.  It is if certain things exist; but we don't

3    know whether those certain things do exist, or not.

4        And it appeared that it would be perfectly appropriate,

5    because The Hague Convention isn't an exclusive service

6    protocol.  It's a means by which you could effect service, but

7    it doesn't obviate the possibility that you could effect

8    service by way of substituting service, or, as you've

9    suggested --

10           **MR. KELLER:**  Leaving it at the --

11           **MR. SPERLEIN:**  Two suggestions.  One, either

12   substitute service at his company that he has admitted to

13   owning in Hong Kong, which we've already done; or what other

14   courts have done -- well, I guess we can't do it, because --

15           **THE COURT:**  Well, the --

16           **MR. SPERLEIN:**  -- they admit to being his attorney;

17   but yeah, those things are allowed.  The one thing that ---

18           **THE COURT:**  Yeah.  I'm going to allow alternative

19   service.

20       And, of course, I always reserve the question when service

21   is accomplished that -- that Mr. Stanislav comes in on what

22   they call a "special appearance" in state court.  I don't know

23   what they call it here.

24           **MR. KELLER:**  Same thing.

25           **THE COURT:**  Yeah, but move to quash; argue that

```
1  service is inappropriate.  And that's the way that you test
2  whether the -- whether the service was ultimately appropriate,
3  or not; but counsel's right.  I mean, I first have to authorize
4  alternative service.  And there's certainly an adequate showing
5  here that, you know, that it would be appropriate.
6         MR. KELLER:  Well, the only thing I would say there,
7  your Honor --
8         THE COURT:  His lawyer doesn't come in.  You don't
9  represent him.  I understand that.  No one comes in.
10        MR. KELLER:  And I can explain to you why, because --
11  and again, I'm not talking about this counsel.  What we've seen
12  in other cases is they have a hearing.  They come in and they
13  say, "You represent him.  Here.  You're served."
14     We don't think they've made any effort to serve, at all.
15  There's certainly no showing that he can't be served.
16        THE COURT:  I thought they did in --
17        MR. KELLER:  Well, I'm not sure.
18        THE COURT:  -- Hong Kong.
19        MR. KELLER:  I'm not sure that service by leaving
20  something at the corporate office is service upon the
21  shareholder.  Under United States law, I'm not sure that's
22  proper service.
23        THE COURT:  Well, I'm not saying it is.  I'm not
24  saying it is, and I'm not saying it isn't; but I'm saying
25  that's what they've done.  That's what they tell me they've
```

1    done.

2        They also tell me that he -- Mr. Stanislav -- has notice of

3    the suit; that is, where there is this suit; a fact that I

4    don't think is being denied; and that he has worked with you

5    and a company counsel -- your company counsel.  That fact

6    hasn't been denied.

7        The question -- what you've denied -- when I say "denied,"

8    what you have said is, "At the present time, I don't represent

9    him."

10            **MR. KELLER:**  Right.

11            **THE COURT:**  That's fair.  That's a fact.  No one says

12   you do.  You don't.

13            **MR. KELLER:**  Right.

14            **THE COURT:**  But we know he knows about the lawsuit.

15   We know he knows that there have been communications between --

16   I guess, on the subject of the lawsuit with your office.  And

17   so he's aware of it; participated in it, in some manner.

18       He has not been served.  No one is accepting service on his

19   behalf.  There's a serious question as to whether or not they

20   can serve him here.  And I think Counsel has made a showing

21   that an alternative form of service is appropriate.  And that's

22   what I'm permitting.

23       And then the question is:  He comes in.  He says that

24   service was flawed.  If he's right, it's flawed.  And that's

25   the end of the matter.  And I grant his motion to quash, if

1    that's what the term is.

2          MR. SPERLEIN:   And we recognize that even if you

3    permit service, that we may get a judgment against him that we

4    can't collect, because the Ukraine doesn't think that it was

5    appropriate service.   That's the risk.

6          THE COURT:   I've been to Ukraine.   I've been to

7    Ukraine.

8          MR. KELLER:   Me, too.

9       The mere fact that the Court has allowed substitute service

10   is not an acknowledgment that there's jurisdiction over this

11   gentleman, I don't believe.   You're just saying, "I'm allowing

12   alternate service."   You're not making any finding whether this

13   gentleman --

14         THE COURT:   I think that's right.

15         MR. KELLER:   Well, no.   When you say, "We may get a

16   judgment against him" --

17         THE COURT:   We're getting a little ahead of ourselves.

18         MR. SPERLEIN:   Absolutely.   No one is denying there's

19   jurisdiction.

20         THE COURT:   The first thing is:   You allow the

21   service.   I'm doing that, but by alternative means.

22      The second thing is that then there's a -- there can or

23   can't be, depending on what he decides to do, a challenge to

24   the service.

25      If he doesn't, he sits back, then he takes the risk that a

1   default is entered if he doesn't appear.  Then a judgment is

2   entered; and then whatever the consequences of that may be.

3   And they may be nothing.

4           **MR. KELLER:**  Right.  No, but I just didn't want --

5           **THE COURT:**  It may be nothing or it may be everything.

6   It may be final, or it may be a nullity.  I understand that.

7       And -- but I want to be careful here not to get too far

8   ahead, because I'm only doing a couple of things today.

9       One, allowing alternative service.

10      Two, allowing early discovery of Mr. -- Romanov?  Is that

11  his name?

12          **MR. KELLER:**  Correct.

13          **MR. SPERLEIN:**  It's "Romanov" or -- sometimes with an

14  o-v; sometimes with an o-f-f.  Romanoff.

15          **THE COURT:**  As in the -- as in "Romanov."

16      And I'm going to grant a preliminary injunction.  I'm going

17  to take a look at *Grupo* again, but I'm going to grant a

18  preliminary injunction, subject to the defense coming in and

19  making a showing as to whether the assets which have been

20  seized are excessive, in the sense that they are greater than

21  the amount of money necessary to satisfy the equitable relief

22  that is being sought in this action.

23          **MR. KELLER:**  Well, I would also -- I don't know if

24  that's encompassed in what you're saying, your Honor, but I

25  would also want the opportunity to come in for release of

```
 1   additional funds.  As I said, you know, there are --

 2           THE COURT:  Granted.

 3           MR. KELLER:  Okay.

 4           MR. SPERLEIN:  Granted he can come in and ask.

 5           THE COURT:  He can come in any time.  I'm here 24/7.

 6           MR. KELLER:  Except the 18th of 2013.

 7           THE COURT:  2013, apparently, I'm --

 8           MR. SPERLEIN:  Hopefully, we'll move faster than that.

 9           THE COURT:  Now on the question of a bond, how did we

10   leave things on a bond?

11           MR. KELLER:  A thousand dollars.

12           THE COURT:  Pardon?

13           MR. KELLER:  A thousand dollars.

14           THE COURT:  Well, that's a bond.

15           MR. KELLER:  It is a bond, and it's a hundred times

16   what they requested in Nevada, but I don't think --

17           THE COURT:  Oh.  In other words, you're not proposing

18   a thousand?

19           MR. KELLER:  Oh, no.  No, no, no, no, your Honor.

20           THE COURT:  I was wondering whether or not we were

21   going to have a stipulation.  I was a little surprised.  Good

22   thing I was sitting down.

23           MR. KELLER:  Not at all, your Honor.  No.

24       In the TRO, they suggested a bond of a thousand dollars,

25   and your Honor accepted that.
```

1          **THE COURT:**  What was the bond in the Nevada?

2          **MR. KELLER:**  A hundred dollars.

3          **THE COURT:**  Pardon?

4          **MR. KELLER:**  A hundred dollars.

5          **THE COURT:**  Forget that.

6          **MR. KELLER:**  Yeah.  We never got the opportunity,

7    because we never got to the point of arguing on the preliminary

8    injunction.

9          **THE COURT:**  Okay.  Let's talk about the bond.

10         **MR. KELLER:**  I think a thousand dollars is not

11   sufficient, where they're freezing at least -- well, $800,000

12   of my client's money here in the United States.  I don't know.

13   I don't think they put a limit on their *Mareva* injunction in

14   Hong Kong, as Mr. Randazza did.  I think they've frozen

15   everything that's in that account over in Hong Kong.

16         **THE COURT:**  What's a bond that you think is

17   appropriate?  I mean, the low end, and then the high end.

18   Mr. Keller would say 800,000.  And you would say a hundred

19   dollars.  So let's start with the proposition of:  What can you

20   really put up in this?

21         **MR. SPERLEIN:**  Well, you know, without my client here,

22   it's hard for me to say that.

23      My concern here about setting the bond without them coming

24   in and making a showing of what assets are available to them --

25         **THE COURT:**  No, no.  I have to set a bond.

1          **MR. SPERLEIN:**  Well, no, no.  And I agree with that;

2   but to increase the bond without knowing whether they have

3   $40 million in the Ukraine, I don't think is fair, because if

4   they're sitting on that, just -- every lawyer -- every person

5   that doesn't pay their lawyer's bill isn't broke.  I guarantee

6   you that.  I can tell you that from personal experience.  They

7   have said they can't pay their lawyers.

8          **THE COURT:**  As far as the lawyer's concerned, they're

9   broke.

10          **MR. KELLER:**  But again, it's not coincidental that

11   once we finally got the injunction lifted in Nevada so the

12   lawyers could be paid, 24 hours later, this lawsuit was filed.

13   I mean, I don't think that's coincidental.  I mean, this

14   lawsuit could have been filed.  They're well aware of what was

15   going on in Nevada.  This lawsuit could have been filed a long

16   time ago.  Some of these infringements they're talking about go

17   back to 2011.

18          **THE COURT:**  Well, I'd like to get a realistic figure,

19   I think.

20          **MR. SPERLEIN:**  10,000, at least until they come in and

21   make a showing.  Then we can reëvaluate and we can go from

22   there.

23          **THE COURT:**  I'll say a $10,000 bond.  And then as soon

24   as you come in and make your showing, whatever you think your

25   showing is appropriate, I'll reëxamine those issues.  I can

1   change it.  I can change it.  Okay.

2       So even though -- I think I'll get the injunction out

3   today.  I'm going to try and get it out today.  And I might get

4   it out today, subject to writing an opinion, because I think

5   it's an appealable order.  So I want to get an opinion out.

6       I don't know that I'll get the opinion out today, but

7   since -- I can do one of two things.  We can keep the TRO in

8   effect by agreement.  And then I can get the opinion out by

9   Friday of this week; or I can issue a preliminary today after I

10  look at *Grupo*, and assuming I agree, and get the opinion out in

11  the next two weeks, or so.

12          **MR. SPERLEIN:**  Your Honor, I'm a reasonable man.

13  Whatever counsel would like to see.

14          **THE COURT:**  I don't know what your grand plan is here,

15  but --

16          **MR. KELLER:**  Well, that assumes I have one,

17  your Honor, which I oftentimes do; oftentimes don't.

18          **THE COURT:**  I don't think you really care.

19          **MR. KELLER:**  Huh?

20          **THE COURT:**  Well, I would think that probably, you

21  know, I would suggest that you simply agree to keep the TRO in

22  effect until Friday.

23          **MR. KELLER:**  Without waiver of any, obviously --

24          **THE COURT:**  Yes.  Yeah, but by extension, by

25  agreement, the parties can agree, and that's sufficient.

1      Is that agreeable with you?

2           **MR. KELLER:**  Sure.

3           **THE COURT:**  Okay.

4           **MR. SPERLEIN:**  I will -- because it says 14 days, and

5  this -- it is with some other folks, we will need to have

6  something in writing that I can send to --

7           **THE COURT:**  No, no.  The writing is the agreement on

8  the -- it's this hearing.  I mean, I can put out a one-sentence

9  Order which says that the parties have agreed to keep the TRO

10  entered into on August -- whatever it was -- in effect until --

11          **MR. KELLER:**  Until the Court --

12          **THE COURT:**  -- until September blah --

13          **MR. KELLER:**  To allow the Court to issue its opinion.

14          **THE COURT:**  -- subject to further Order of the Court.

15          **MR. SPERLEIN:**  Thank you, your Honor.

16          **THE COURT:**  Because you've got to deal with people.

17  Thank you very much, everybody.

18          **MR. KELLER:**  Thank you, your Honor.

19          **THE COURT:**  Always a pleasure.

20      (At 3:14 p.m. the proceedings were adjourned.)

21  I certify that the foregoing is a correct transcript from the

22  record of proceedings in the above-entitled matter.

23

24  _____     October 22, 2012
    Signature of Court Reporter/Transcriber    Date
25  Lydia Zinn

Lydia Zinn, CSR #9223
Official Reporter - U.S. District Court
(415) 531-6587